Terry PENNYCUFF, Appellant
(Defendant Below),

v.

STATE of Indiana, Appellee
(Plaintiff Below).

No. 49S02–0104–CR–213.

Supreme Court of Indiana.

April 18, 2001.

Jodi Kathryn Stein, Marion County Public Defender Agency, Indianapolis, IN, Attorney for Appellant.

Karen M. Freeman–Wilson, Attorney General of Indiana, Timothy W. Beam,

Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

SHEPARD, Chief Justice.

A jury found appellant Terry Pennycuff guilty on two counts of incest, three counts of child molesting, and one count of sexual misconduct with a minor for carrying on a sexual relationship with his teenage daughter over a three-year period. The Court of Appeals ordered a new trial, holding that Pennycuff's lawyer was ineffective for failing to object to evidence that violated Pennycuff's rights under *Doyle v. Ohio.*[1] *Pennycuff v. State,* 727 N.E.2d 723 (Ind.Ct. App.2000).

We conclude that the caselaw points to a different outcome.

### How Pennycuff's Trial Unfolded

The State's first witness at trial was Pennycuff's daughter, T.P. (R. at 225.) T.P. described in detail numerous sexual advances by, and contacts with, her father. (R. at 227–38, 244–54, 257–58.) Among other things, T.P. accused her father of videotaping and photographing her in the nude on two separate occasions. (R. at 233–34, 246.) She testified that her father gave her money after some of their sexual encounters. (R. at 228, 234, 244.) She also said that some of these incidents occurred at home while her brother was in another room, (R. at 245), although no one besides herself actually witnessed any of the occurrences.

T.P. testified that Pennycuff had written words and initials on certain pages of a calendar to memorialize some of these incidents. (R. at 250–51, 253–54.) For example, she testified that early on Christmas morning in 1995, she had intercourse with her father before they woke her brother

and sister, and that Pennycuff entered an "I" in the calendar to document the occurrence. (R. at 252–53.)

T.P. explained that she kept silent about her father's misconduct because he told her she could be jailed for prostitution, and that he would kill them both if she spoke. (R. at 248–49.) She eventually disclosed what had been going on because her father, by then divorced from T.P.'s mother, described his new girlfriend's daughter as "cute." (R. at 260.) T.P. became concerned for the safety of that child and of her own eight-year-old sister. (*Id.*) T.P. testified that she got along well with this new girlfriend. (R. at 256.) Regarding her relationship with her father, T.P. testified:

Q. [T.P.], how do you feel about your dad right now?

A. I love him.

Q. You still love him?

A. (No audible answer.)

THE COURT: You have to answer yes or no.

A. Yes.

Q. Is there any anger?

A. Yes.

Q. Why?

A. Because I want him to pay for what he did to me. I want him to stop lying. I wish he'd tell the truth.

(R. at 263.)

On cross-examination, the defense methodically sought to undermine T.P.'s credibility by delving into T.P.'s relationship with each of her parents. T.P.'s father first had inappropriate sexual contact with her in May 1993. (R. at 226.) When her parents separated in October 1994, however, T.P. elected to stay with her father

---

**1.** In *Doyle v. Ohio,* 426 U.S. 610, 619, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), the U.S. Supreme Court held that use for impeachment purposes of a defendant's silence after arrest and a *Miranda* warning violates the Due Process Clause of the Fourteenth Amendment.

(although her brother and sister lived with their mother) because she and her mother did not get along and even physically fought at times. (R. at 270, 280.) Appellant Pennycuff got custody of T.P. and her brother in April 1995, but T.P. moved back in with her mother during the summer of 1995 to avoid further molestation by her father. (R. at 283.) However, T.P., who admitted to being "rebellious," (R. at 270), again quarreled with her mother, (R. at 284–85), and moved back in with her father in the fall of 1995, (R. at 286). Subsequently, T.P.'s relationship with her mother improved, although T.P. still did not confide in her mother about the molestation for another month or two. (R. at 296–97.)

After establishing this sequence of events, defense counsel asked T.P., "During this period of time—you—you have always kind of just vacillated between your mother and father, whichever—depending upon whichever person kind of treated you the best; is that right?" (R. at 299–300.) T.P. replied, "Yes." (R. at 300.) Defense counsel went on to establish that four months after T.P.'s accusations, T.P. paged her father because she and her mother were fighting. (Id.) T.P. asked her father to come over to her mother's house where T.P. was staying, which he did. She asked her father to take her home with him, but he declined because he was under a no contact order. (R. at 301–02.)

The defense also attacked T.P.'s claim that her father paid her for sex by eliciting admissions that T.P. helped with housework, (R. at 308), and that he had given her money at times before the molestation began, (R. at 307).

The State's next witness was T.P.'s brother, who is a year and a half younger than she. (R. at 225, 323.) He testified that Pennycuff sometimes went into another room with T.P., and ordered the boy to stay in the living room. (R. at 326–27.) He also testified that, although he had no knowledge of any sexual relationship between Pennycuff and T.P., Pennycuff had sometimes given T.P. money. (R. at 327.)

On cross-examination, the defense sought to elicit testimony from the brother that T.P. disliked their father's new fiancée, Jane, and had threatened to ruin the planned wedding. (R. at 331.) The boy acknowledged that T.P. had expressed dislike for Jane, but he denied having heard T.P. make any such threat. (Id.)

The State next called Marion County Sheriff's Department Detective Sergeant Carmie Godan. (R. at 333.) Detective Godan testified about T.P.'s demeanor when she gave her initial statement. (R. at 336.) Detective Godan described T.P. as confused and embarrassed, and said that T.P. blamed herself for the relationship. (Id.) Godan also testified that, during a search of Pennycuff's apartment, police found the calendar that T.P. described. (R. at 340.)

On cross-examination, Godan conceded that during their search the police found no videotape or photographs showing T.P. nude. (R. at 355–56.) Defense counsel also established that Pennycuff had no advance warning of the search. (R. at 358.)

The State then called T.P.'s mother, who testified that the night T.P. disclosed what Pennycuff had done, T.P. was upset and afraid of going to jail. (R. at 390.) She said Pennycuff had given T.P. money at times and that, when asked, he said he had paid T.P. for helping with various household chores. (R. at 391–92.)

On cross-examination, T.P.'s mother admitted that before T.P. accused Pennycuff of sexual misconduct, the mother herself had twice broached the subject of molestation. (R. at 397–98.) The first time was during custody negotiations, when the

mother asked T.P. if her father had ever touched her and T.P. responded that the mother was crazy for asking such a question. (*Id.*) Then, about a year before her divorce, the mother asked T.P. in the presence of a therapist whether there had been any molestation, and T.P. said no. (R. at 398.)

The State's final witness was a psychiatric social worker, (R. at 405), who testified about T.P.'s demeanor during their meetings, (R. at 407), and said that children who are sexually abused by a family member rarely come forward immediately, (R. at 408).

When the State rested, then, the testimony of T.P. stood as the centerpiece of its case. Pennycuff's counsel managed to plant the seeds for a defense focused on T.P.'s credibility.

To do this, the defense presented two witnesses: Pennycuff and his second wife Jane (whom he married the same day that he was later served with the search warrant based upon T.P.'s accusations). (R. at 417–18.) Jane testified that she and Pennycuff had accelerated their wedding date, and married in Louisville rather than locally, because of T.P.'s threats to ruin the wedding. (R. at 418–19.) She also testified about the lock box in which the calendar was found:

Q. And the lock box. Did [Detective Godan] ask [Pennycuff] for the keys to this box?

A. I don't know if it was her, but one of the detectives ask him for the key.

Q. Did he cooperate?

A. Yes, he did.

Q. Give her the keys and everything?

A. Yes.

Q. All right.

A. He told them he had nothing to hide. That they could search his apartment all they wanted to, that he had nothing to hide.

(R. at 421–22.)

On cross-examination, Jane admitted that she got along well with T.P. and that T.P. had never directly told Jane that she disliked Jane or opposed her marriage to Pennycuff. (R. at 427.)

Pennycuff then testified, to refute his daughter's allegations. (R. at 438.) He began by saying he had never been arrested prior to these events, and had always maintained employment and supported his family. (R. at 440.) He testified he had paid his daughter for helping around the house, but never had a sexual relationship with her or paid her for sex. (R. at 444.) Credibility and cooperation were part of Pennycuff's theme on direct examination:

Q. The night that the detectives came into your home and executed a search warrant, that same day did Detective Godan take a statement from you? [2]

A. Yes, she did.

Q. Did she ask you about any of these allegations that you've heard about at the trial here?

A. Yes, she did. She sat at the table and did a—a little cassette tape.

Q. And what did—

A. And see if I was going to do one. And I was having a sugar attack.[3] I—I was in and out, kind of, you know, shaky and dizzy. I had some stuff. I don't remember it happening.

---

**2.** Pennycuff received a *Miranda* warning and acknowledged it in writing before this questioning. (Supp. R. at 51.)

**3.** Jane Pennycuff had earlier testified that Pennycuff is diabetic. (R. at 415.)

Q. All right. But you did cooperate and you did give a statement; is that correct?

A. Yes, I did.

Q. You had nothing to hide? You said—

A. No, I told her I had nothing to hide in my apartment.

Q. And you—and you told her—and you answered every question she asked you; is that correct?

A. Yes, I did.

Q. What did—what did you tell her that day regarding whether—whether or not you had any sexual relationship?

A. Well she asked me if I'd had sexual relations with my daughter. I told her, no, I didn't.

Q. Did she ask you why she thought—why you thought your daughter would—would make these allegations?

A. Yes, she did. Why would your daughter have these charges against you if you hadn't of been doin' it to her.

Q. What did you say?

A. And I told her that the reason was that she wanted to be emancipated and she'd asked me two or three times if she could be emancipated so she could live with her mother. And I told her she can go live with her mother all she wanted, but I had custody of her. If she wanted to be emancipated then I was the one that had to do it if she, you know, wanted out on her own. And I told her, no, she wasn't gonna run the streets on her own. She wasn't old enough and she wasn't workin'.

(R. at 445–46.) He later testified about an exchange that occurred three days before T.P. made her accusations:

[T.P.] said, yes, me and my mother are goin' to ruin your wedding. She said, why should you be happy if you won't let me go out and be happy on my own. I said, [T.P.], I told you you can go live with your mom I said. And she said, well, she said, you know, more or less that she wanted to go live with her mom. And I told her she could. And she said that she just want—wanted to be happy on her own. She didn't wanna live with her mom. She said her mom would take her back as a roommate and not a daughter.

(R. at 446, 448.)

Pennycuff's counsel questioned him about the calendar entries that supposedly recorded sexual contacts with his daughter. (R. at 449–56.) Pennycuff provided alternative explanations for various entries. (*Id.*) For example, he explained that the "I" noted on December 25 recorded a missed insulin shot. (R. at 453.)

The prosecutor took up this topic while cross-examining Pennycuff:

Q. Detective Godan talked to you and asked you about those initials on the calendar; didn't she?

A. Ah—I don't think she did.

Q. You don't remember her mention a calendar and ask you about those initials?

A. No, they took that stuff and walked out the door with it.

Q. My question is: You do not remember Detective Godan . . .

A. No, I don't.

Q. . . . asking you about the initials?

A. No, I don't.

Q. And you don't remember her giving you a chance to explain those initials?

A. No, I don't.

Q. And you don't remember not responding to her at that time?

A. No.

(R. at 493.)

After the defense rested, the prosecutor called Detective Godan back to the stand for the following exchange:

Q. Did you ask the Defendant, Terry Pennycuff, about the calendar?

A. Yes, I did.

Q. Did you ask him about the initials?

A. Yes, I did.

Q. And how did he respond?

A. He didn't give me any response.

Q. In fact, did you ask him whether or not—told him that this was his chance to respond?

A. Yes.

Q. To that?

A. Yes, I did.

Q. And he did not. No further questions.

(R. at 498–99.)

The prosecutor spoke about the calendar during the rebuttal portion of her closing argument:

Let's talk about the calendar because that's something that's just—it's—you've gotta believe [the daughter] or the Defendant. You've got to choose which one you're going to believe. Okay. Who is the more credible witness. I already talked about [the daughter's] credibility. Untouchable. Unbelievable. You can't get a better witness than that. Now let's talk about the Defendant. Let's talk about what he had time to figure out what those initials stood for. He didn't tell the detective anything about it when he had an opportunity to explain it. He gets up there and he had overnight to think about it because we introduced some of these things.

(R. at 729.)

Pennycuff's attorney did not object to any of the references to Pennycuff's non-responsiveness.

The actual transcript of the interview conducted during the search reveals that Pennycuff gave no verbal response to five questions. (Supp. R. at 205–08.) The first two times, Godan reacted "No? Okay." and continued the questioning.[4] The third time, when Godan asked "No?" Pennycuff confirmed "No."[5] The last two times, Pen-

4.

Q. Okay. Um, I'm here because, like I was saying that, your daughter, [T.P.] has come in and given me a statement on things that happened between you and her. Okay? Um, she seems very upset. She's saying a lot of things that happened for the last three years. Do you have any idea what she's talking about?

A. (No verbal response).

Q. No? Okay. She's saying she, started when she was thirteen. That, you remember taking any kind of videos of her in a black slip?

A. I had a video camera, yeah. But, no.

Q. When you lived over on the other street on Midvail, or something. You had a basement.

A. I had a basement.

Q. Um-huh (indicating yes). She said that you took her down there with the video camera and, in this black slip that her mom got her.

A. (No verbal response).

Q. No? Okay. Um, have you noticed in the last three years or so, that your daughter's been going to the hospital a lot? You know why?

A. (Inaudible).

Q. Why's she been going?

A. Cause she's having sex.

Q. With whom?

A. Well, I, I don't know....

(Supp. R. at 205.)

5.

Q. Okay. Have you ever had sex with her?

A. No, I haven't.

nycuff responded to Godan's "No?" with an inaudible response.[6] The last instance involved the following exchange:

Q. Well, also, in there, she says that that book, it has the 49'ers on it, that you would write in there different times with different initials when you'd had sex with her.

A. (No verbal response).[7]

Q. No?

A. (Inaudible).

Q. Okay. Well, do you have any, anything to say on your behalf on this?

A. Yeah. She's lying just to get out of here.

(Supp. R. at 208.)

### Post–Trial Proceedings

After his conviction, Pennycuff filed a Belated Motion to Correct Errors. (Supp. R. at 61.) Among other things, he claimed that the State's references to his post-*Miranda* silence for impeachment purposes entitled him to reversal under *Doyle*. (Appellant's Br. at 9, 22.) The trial court heard evidence and argument, then denied the motion in all respects. (Supp. R. at 146–47, 154.)

On appeal, the Court of Appeals found no fundamental error,[8] but held that Pennycuff's counsel was ineffective in failing to object to the references to Pennycuff's si-

Q. Okay. She's saying that you have for many years.
A. (No verbal response)
Q. No?
A. No.
(Supp. R. at 206.)

6. The fourth exchange went as follows:
Q. Okay. She's saying that you did things, you did things to her in the bunkbeds. You taught her oral sex and all that stuff.
A. (No verbal response).
Q. No?
A. (Inaudible).

lence. *Pennycuff*, 727 N.E.2d at 729. It found a dispositive *Doyle* violation and ordered a new trial. *Id.* at 733–34. The State seeks transfer to this Court.

### Standard for Ineffective Assistance of Counsel

Our standard in evaluating claims of ineffective assistance of counsel is straightforward:

Reversal for ineffective assistance of counsel is appropriate in cases where a defendant shows both that counsel's performance fell below an objective standard of reasonableness and that said deficient performance so prejudiced defendant as to deprive him of a fair trial. *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 ... It shall be strongly presumed that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. Judicial scrutiny of counsel's performance is highly deferential and should not be exercised through the distortions of hindsight. Isolated poor strategy, inexperience, or bad tactics do not necessarily amount to ineffectiveness of counsel. If deficient performance of counsel can be proven, defendant must further show a reasonable probability that it altered the outcome of the case. *Id.*

Q. And I asked her why that she hadn't told a long time ago. She said because you threatened to kill her.
A. No. She tried to kill herself.
(Supp. R. at 206.)

7. During a hearing on a belated motion to correct error, Detective Godan stated, based upon her follow-up question "No?", that Pennycuff's initial "no response" was almost certainly a negative headshake. (Supp. R. at 211, 219.)

8. We summarily affirm the Court of Appeals on this point. Ind. Appellate Rule 58(A)(2).

*Bellmore v. State,* 602 N.E.2d 111, 123 (Ind.1992) (citations omitted).

> When evaluating ineffectiveness claims, courts must be cognizant of the fact that "[t]here are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065, 80 L.Ed.2d at 695. Accordingly, when appellate courts are considering the claim of actual ineffectiveness of counsel, they "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* at 690, 104 S.Ct. at 2066, 80 L.Ed.2d at 695.

*Thompson v. State,* 671 N.E.2d 1165, 1168 (Ind.1996).

■ When the claim is that defense counsel failed to object to certain evidence or testimony:

> This Court will not speculate about what may have been the most advantageous strategy in particular cases. A deliberate choice made by counsel for some tactical or strategic reason does not establish ineffective assistance of counsel. *Owens v. State* (1984), Ind., 464 N.E.2d 1277. Moreover, the decision to forego perfunctory objections having little chance of success or no direct or substantial relationship to the main thrust of the defense is within the realm of reasonable trial strategy. *Bevill v. State* (1985), Ind., 472 N.E.2d 1247. The appellant must show that counsel's alleged failure to act or his choice of strategy harmed the cause. *Kelly v. State* (1983), Ind., 452 N.E.2d 907. When an ineffective assistance claim is predicated on counsel's failure to interpose an objection, appellant has the burden to show that a proper objection would have

been sustained by the trial court. *Kimble v. State* (1983), Ind., 451 N.E.2d 302. *Hudson v. State,* 496 N.E.2d 1286, 1295 (Ind.1986).

## The Claim of Cooperation

The Court of Appeals opinion does not address the significant events at trial that preceded the prosecutor's comments about Pennycuff's non-responsiveness. In response to his own attorney's questions at trial, Pennycuff claimed that he had fully cooperated when he was questioned by the police during the search. (R. at 445.) Only after this assertion did the prosecutor raise the issue of Pennycuff's failure to respond to questions about the calendar entries. (R. at 493.)

■ It was perfectly reasonable for Pennycuff's lawyer to put him on the stand. Indeed, in light of the victim's testimony, calling Pennycuff to rebut her on the facts and to claim she was lying out of vengeance, and trying to portray Pennycuff as a wronged man who had voluntarily provided information to the police was about the only sensible defense. Because there were no other witnesses to the alleged misconduct, Pennycuff's credibility in rebutting his daughter's accusations was critical. Counsel that performs in a reasonably effective manner, evaluated without the distortion of hindsight, passes constitutional muster. *Burr v. State,* 492 N.E.2d 306, 307–08 (Ind.1986). Although the claim of cooperation did allow the State to point out that Pennycuff did not respond to the question about the calendar, defense counsel acted reasonably in portraying Pennycuff as cooperative and forthcoming, and in portraying T.P. as manipulative and deceitful.

■ Having concluded that this basic trial strategy was reasonable under the circumstances, we are led to the question of whether Pennycuff's counsel was inef-

fective in failing to object to the State references to Pennycuff's non-responsiveness. The basic message of *Doyle* is that impeachment on the basis of a defendant's silence is fundamentally unfair and violates Due Process. *Anderson v. Charles,* 447 U.S. 404, 407, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980). *Miranda* warnings inform the accused of his right to remain silent, and implicitly assure him that his silence will not be used against him. *Id.* at 407–08, 100 S.Ct. 2180.

In *Doyle,* however, the U.S. Supreme Court explicitly recognized that post-arrest silence *may* be used "to contradict a defendant who testifies to an exculpatory version of events and claims to have told the police the same version upon arrest." *Doyle v. Ohio,* 426 U.S. 610, 619 n. 11, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976) (citing *United States v. Fairchild,* 505 F.2d 1378, 1383 (5th Cir.1975)). In *Fairchild,* the defendant's counsel elicited testimony from a state witness that the defendant had fully cooperated. *Fairchild,* 505 F.2d at 1383. The court then allowed testimony by another state witness that the defendant had refused to make a statement following a *Miranda* warning. *Id.* at 1382. The court held that a criminal defendant's silence following arrest and warning "is not excluded so that the defendant may freely and falsely create the impression that he has cooperated with the police when, in fact, he has not." *Id.* at 1383. Applying this principle, the court determined that "Fairchild opened the door to a full and not just a selective development of the subject.... [O]nce [the defendant] did broach [the subject of cooperation] the bar was lowered and he discarded the shield which the law had created to protect him." *Id.* (citations omitted).

Subsequent federal authority continues to recognize an exception to *Doyle* for claims of cooperation by a defendant. *See,*

*e.g., United States v. Conlin,* 551 F.2d 534, 537 (2nd Cir.1977) (where defendant maintained he had spoken throughout the incident at issue, government was allowed to rebut this assertion with evidence of silence), *cert. denied,* 434 U.S. 831, 98 S.Ct. 114, 54 L.Ed.2d 91 (1977); *United States v. Allston,* 613 F.2d 609, 611–12 (5th Cir. 1980) (defendant "opened the door" to cross-examination regarding his post-arrest silence, and closing argument questioning why the defendant had not come forward with information for a year carried the "lingering fragrance of rebuttal").

The *Fairchild* court explicitly limited this exception, so that a claim of cooperation does not give a prosecutor carte blanche to use silence as direct evidence of the defendant's guilt. *Fairchild,* 505 F.2d at 1383. The silence may be used only to rebut the impression of cooperation. *Id.*

The Seventh Circuit discussed this same distinction in *United States v. Shue,* 766 F.2d 1122 (7th Cir.1985). Defendant Shue testified on direct examination that he had cooperated by providing fingerprints and hair and handwriting samples, and by participating in lineups. *Id.* at 1128. This created an impression of general cooperation which, the court held, the prosecution was entitled to rebut. On cross-examination, however, the prosecutor asked Shue four times about his refusal to give a statement to the authorities. Shue replied each time that he had been exercising his right to remain silent. *Id.* In closing argument, the prosecutor emphasized that "[Shue] refused to talk to the FBI, refused. And no one ever heard of this preposterous, incredible story of a frame until he hit the witness stand." *Id.* at 1128–29. The court held that given these facts, the prosecutor's use of Shue's silence was "an obvious reach beyond fair limits to impeach his explanatory story as a recent fabrication." *Id.* at 1132.

Here, no such overreaching occurred. Pennycuff specifically claimed credit not just for general cooperation, but for having answered each of Detective Godan's questions. (R. at 445.) The prosecutor's questions to Pennycuff and Detective Godan were relevant to counter the defense claim that Pennycuff openly answered all queries, including those about the calendar entries. After eliciting testimony refuting this claim the prosecutor moved on without belaboring the point. (*Id.*) In closing argument, the prosecutor referred only briefly to Pennycuff's failure to explain the calendar entries at his first opportunity. These references were sufficiently related to Pennycuff's claim of cooperation to qualify as a rebuttal.

Because the State was entitled to point out and comment upon Pennycuff's non-responsiveness regarding the calendar, Pennycuff's counsel was not ineffective for failing to object. Applying the principles of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), we have held that "a decision to forego perfunctory objections having little chance of success or no direct or substantial relationship to the main thrust of the defense is within the realm of reasonable trial strategy." *Hudson v. State*, 496 N.E.2d 1286, 1294–95 (Ind.1986).

The risk that such might occur was simply a modest price to pay for the benefit of counsel's larger strategy of portraying his client as a cooperative fellow who'd been done wrong.

### What If Pennycuff Wasn't Silent?

We have examined Pennycuff's ineffective assistance claim on the grounds that he has presented it to us: his lawyer failed to afford him appropriate protection for his having not answered some of Detective Godan's questions. As the dissent points out, Pennycuff's silence in response to Detective Godan's calendar query may be viewed another way. It is possible that Pennycuff silently shook his head after the first question and then, when prompted for an oral response, muttered unintelligibly. This reaction is still insolubly ambiguous, because a headshake might have signaled chagrin over learning the extent of the police's knowledge as easily as denial. If the former is true, our analysis that assumes non-responsiveness is correct.

Assuming that Pennycuff shook his head in denial, however, the prosecutor's reference to the fact that Pennycuff had time to think up explanations for the suspicious calendar entries would not be objectionable under *Doyle*, because Pennycuff did not stand silent. If Pennycuff did respond, one thing we know for sure is that his lawyer was not ineffective in failing to protect Pennycuff's *Doyle* rights.

The question then becomes whether Pennycuff's counsel was constitutionally ineffective in failing to correct Detective Godan when the detective stated at the trial that Pennycuff gave no response when queried about the calendar.

Under *Strickland*, the answer can be yes only if this heat-of-the-battle oversight was objectively unreasonable when viewed without the benefit of hindsight, and if there is a reasonable probability that the jury would have changed its verdict had this clarification occurred. The second prong is dispositive. We deem it highly unlikely that the jurors would have changed their verdict had they believed that Pennycuff dissembled by shaking his head and then muttering a response rather than that Pennycuff failed to answer the question.

### Other Claims of Ineffective Assistance of Counsel

On appeal, Pennycuff raised three additional claims of ineffective assistance of counsel. The Court of Appeals did not

address these issues because it ordered a retrial based on the lawyer's failure to protect Pennycuff's *Doyle* rights. Because we conclude differently on that issue, we proceed to address these additional claims.

■ *The Therapist's Hearsay Testimony.* Pennycuff claims that his attorney was ineffective in failing to object when T.P.'s therapist gave hearsay testimony, as follows:

Q. Are you still seeing [T.P.]?

A. Yes, I am.

Q. Did she identify who the culpitraitor [sic] was?

A. Yes, she did.

Q. What was that?

A. She stated that it was her father.

(Appellant's Br. at 19–20, R. at 407.)

■ Even assuming that an objection would have been sustained, a failure to object does not constitute ineffective assistance of counsel if the decision to remain silent "could well have been a strategic decision by counsel." *Charlton v. State,* 702 N.E.2d 1045, 1051 (Ind.1998) (citation omitted). Before the therapist testified, T.P. personally and unequivocally testified that Pennycuff repeatedly molested her. In *Bannowsky v. State,* 677 N.E.2d 1032, 1035 (Ind.1997) we recognized that a defense attorney might pass up an opportunity for an objection out of a desire to avoid focusing the jury's attention on a particular statement.

Here, Pennycuff correctly asserts that the therapist's statement may have bolstered T.P.'s credibility to some degree. The defense attorney may well have decided, however, to let the brief statement pass unremarked rather than to highlight it with even a sustainable objection. This course of action did not exceed the bounds of reasonable performance by a lawyer, so Pennycuff's claim fails under the first prong of *Strickland.*

*The X–Rated Stuff.* When the State called Detective Godan to testify about executing the search warrant at Pennycuff's apartment, she explained that it authorized seizing the calendar, any kind of child pornography, and other pertinent items the victim had told police would be in the apartment (like Polaroid pictures of her in the nude). (R. at 337, 355.) Defense counsel objected to introduction of the whole calendar, and thus only parts were admitted. (R. at 341, 344.)

On cross-examination, counsel extracted from the detective her acknowledgements that much of what the victim had claimed the police would find in the apartment was not there at all.[9]

Over the prosecutor's objection, the defense managed to elicit the detective's confirmation that a background check revealed that Pennycuff had never been arrested or recorded as involved in any prior incidents of the sort for which he was on trial. (R. at 356–57.) Presumably anticipating the State's re-direct, counsel asked whether the officer had found other items, like X-rated videos, magazines, and a collage of movie stars in various stages of dress. (R. at 357, 360.) These were all in the apartment on the day of Pennycuff's wedding, counsel observed. (R. at 357.) Yes, said the officer. (*Id.*)

On re-direct, the State offered up the collage, a reasonably inoffensive item, and the defense had no objection. (R. at 359.) The prosecutor asked whether the detective drew any inferences from the materials about Pennycuff and pedophilia based

9.

Q. Did you find a video tape of him filming her dancing in her slip?

A. No.

(R. at 355.)

on her experience as a detective in the field. (R. at 361.) Defense counsel objected, more than once, to this effort, such that the prosecutor eventually abandoned it. (R. at 361–66.) The prosecutor moved instead to admit a magazine named *Hawk,* cover story "Mickey's such a naughty young girl." (R. at 367, 371.) It bore descriptions such as "Purely 18—The Innocent Babes You Crave!" and "The youngest babes allowed by law!" (R. at 371.) Defense counsel forcefully objected. (R. at 367–68.) The prosecutor said she was entitled to use these to rebut the defense's suggestion that Pennycuff was a "good guy" with "no, you know, criminal history." (R. at 368.) The court overruled the objection. (R. at 369.)

■ Pennycuff contends his lawyer was ineffective for asking the detective about the tapes and magazines, (Appellant's Br. at 14–15), but it seems that counsel's objective was to emphasize that much of what the victim had said to the police turned out to be unverifiable and to blunt the effect of the videos and collage by noting that Pennycuff did not take any effort to hide them, even from his new wife. As for *Hawk,* the magazine featuring pubescent girls, counsel worked hard at keeping it out, but the court saw it as relevant to the charge and the general defense that the victim was lying about Pennycuff's sexual interest in his young daughter.

All in all, we are not persuaded that Pennycuff has overcome the presumption that his lawyer performed reasonably well on this score.

■ *The Sexual Device.* During direct examination, the prosecutor questioned T.P. as follows:

Q. Now, [T.P.], did your father ever ask you to use any sexual toys?

A. Yes, he did.

Q. Do you—tell—tell the jury what he did.

A. It was right before the divorce. He was going through a box of personal items that him and my mother had had. He pulled out a dildo and asked me if I would be interested in using it. And I told him no. I never used it. . . .

Q. I'm going to show you what's been marked for identification purposes as State's Exhibit One and ask you to identify this for the jury.

A. That is the dildo he asked me if I would like to use.

(R. at 236.) Pennycuff claims ineffective assistance because his defense counsel did not object to admission of the sexual device into evidence. (Appellant's Br. at 17.)

Pennycuff has not shown that he suffered prejudice over this failure to object. T.P.'s mother testified that she purchased the device while married to Pennycuff, because Pennycuff experienced difficulty getting an erection. (R. at 399.)

The introduction of the device served to bolster Pennycuff's arguments, i.e. that he suffered from impotence and was therefore physically incapable of having done some of the things his daughter described. (R. at 715, 719.) Nonetheless, T.P.'s testimony about Pennycuff's inappropriate offer certainly painted Pennycuff in an unflattering light. We accept Pennycuff's claim that most lawyers would have objected, and that it was error not to do so. Pennycuff has not shown, however, that any damage outweighed the benefit he received in increased credibility regarding his claim of impotence. This claim therefore fails under the second prong of *Strickland.*

■ *A Cumulative Recap.* Errors by counsel that are not individually sufficient to prove ineffective representation may

add up to ineffective assistance when viewed cumulatively. *Williams v. State,* 508 N.E.2d 1264, 1268 (Ind.1987) (citation omitted). Here, however, that is not the case. Defense counsel's handling of the issues related to Pennycuff's non-responsiveness to the calendar question, to the therapist's hearsay testimony, and to the pornography collection all fell within the range of reasonable trial performance. Counsel's only error was in failing to object to introduction of the sexual device, so our conclusion stands.

### Differing Reasonable Doubt Instructions

■■■ Pennycuff asks for a new trial because the court gave different preliminary and final reasonable doubt instructions, although he concedes that both were correct statements of law.[10] (Appellant's Br. at 6, 25.) Defense counsel objected to the final instruction on the basis that an inconsistency might confuse the jury. (R. at 500–01.)

We recently dealt with a very similar claim in *Albrecht v. State,* 737 N.E.2d 719 (Ind.2000). In *Albrecht,* the court gave the same two instructions that were given here, but gave both at the same time. *Id.* at 730.

Albrecht claimed, as Pennycuff claims, that the combination of instructions confused the jury. *Id.,* (Appellant's Br. at 25.) We held otherwise, noting that "[s]imply because the language of the instructions differs, it does not necessarily follow that the definitions are inconsistent or conflicting." *Id.* at 731. We found no reasonable likelihood that the different instructions led the jurors to convict Albrecht based upon constitutionally insufficient proof of guilt. *Id.*

The gap in time between the two instructions here does not change our conclusion. Pennycuff argues that, because different jurors may have looked to different instructions for guidance, their verdict was not truly unanimous. (Appellant's Br. at 25–26.) We disagree. Each juror was guided solely by correct statements of the

---

10. The preliminary instruction stated, in pertinent part:

A reasonable doubt is a fair, actual and logical doubt that arises in your mind after an impartial consideration of all the evidence and circumstances in the case. It should be a doubt based upon reason and common sense and not a doubt based upon imagination or speculation.

To prove the defendant's guilt of the elements of the crime charged beyond a reasonable doubt, the evidence must be such that it would convince you of the truth of it, to such a degree of certainty that you would feel safe to act upon such conviction without hesitation, in a matter of the highest concern and importance to you.

(R. at 92.) The final instruction stated:

The State has the burden of proving the Defendant guilty beyond a reasonable doubt. Some of you may have served as jurors in civil cases, where you were told that it is only necessary to prove that a fact is more likely true than not true. In crimi-

nal cases, the State's proof must be more powerful than that. It must be beyond a reasonable doubt.

Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt. There are very few things in this world that we know with absolute certainty, and in criminal cases, the law does not require proof that overcomes every possible doubt. If, based upon your consideration of the evidence, you are firmly convinced that the Defendant is guilty of the crimes charged, you should find him guilty. If, on the other hand, you think there is a real possibility that he is not guilty, you should give him the benefit of the doubt and find him not guilty.

(R. at 131.) In *Winegeart v. State,* 665 N.E.2d 893, 902 (Ind.1996), a majority of this Court expressed a preference for the latter instruction. However, acknowledging the differences of opinion within the Court, we specifically declined to require the latter. *Id.*

law on reasonable doubt. Due process does not demand that each juror's subjective view of reasonable doubt be identical. It demands only that each juror require a constitutionally sufficient quantum of evidence to convict. Both the instructions at issue meet this test. Pennycuff's argument fails.

### Conclusion

We grant the State's petition to transfer and affirm the judgment of the trial court.

SULLIVAN and RUCKER, JJ., concur.

DICKSON, J., dissents with separate opinion.

BOEHM, J., dissents with separate opinion, in which DICKSON, J., concurs in Part I.

DICKSON, Justice, dissenting.

I agree with the analysis of Justice Boehm in Part I of his dissenting opinion. Because these considerations lead me to conclude that the judgment of the trial court should be reversed, I express no opinion on the remaining issues.

BOEHM, Justice, dissenting.

I respectfully dissent and would deny transfer. I believe the Court of Appeals reached the correct result, although not for the same reasons I would give. I also believe that to the extent the majority opinion offers guidance in future cases, it sets very dangerous precedents.

### I.

It seems to me that this record supports the claim of ineffective assistance of counsel. The "transcript" of Pennycuff's kitchen interview after Miranda warnings reveals several exchanges with the investi-

gating officer, Detective Godan, along the following lines:

Q [Godan]: Do you have any idea what [T.P.] is talking about?

A [Pennycuff]: (No verbal response)

Q [Godan]: No? Okay. She's saying she, started when she was thirteen.

The prosecution contended that these "refusals to answer" rebutted Pennycuff's claim of cooperation with the investigation triggered by his daughter's allegations. The defense made no coherent response to this portrayal of Pennycuff as a liar in his claim at trial to have cooperated with the investigation. The Court of Appeals also viewed these exchanges as refusals to answer, but found them protected by *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). The majority of this Court addresses the *Doyle* issue at length, concluding that Pennycuff's post-Mirandized silence in response to Detective Godan's question was admissible to rebut his claim of having cooperated with the investigation of his daughter's allegations.

Assuming Pennycuff did refuse to respond to Detective Godan, the prosecutor's use of that refusal is at best dubious under *United States v. Shue*, 766 F.2d 1122 (7th Cir.1985), cited by the majority. That case held silence admissible to rebut a claim of cooperation, but not admissible as evidence of guilt in the charged crime. *See id.* at 1132 ("The government violated appellant's right to due process by using his post-arrest silence in an obvious reach beyond fair limits to impeach his explanatory story as a recent fabrication."). The latter is what happened here. The State's closing argument included:

Now let's talk about the Defendant. Let's talk about what he had time to figure out what those initials stood for. He didn't tell the detective anything about it when he had an opportunity to explain it. He gets up there and he had

overnight to think about it because we introduced some of these things.

The Court of Appeals concluded that failure to raise the *Doyle* issue was ineffective assistance. Perhaps the majority is correct that this alone did not rise to that level, but it gets worse.

The majority also acknowledges that this "transcript" may simply reflect nonverbal negative responses. It seems to me the normal reading of this interview is that Pennycuff did answer each of these questions, and did so by a negative shake of the head or other clear nonverbal response that communicated a negative answer to the questioner. In each case, the claimed nonresponse is followed by the questioner's apparently taking the nonverbal response as a negative answer, and proceeding as if a negative response had been given. If this had been a deposition, the interrogator or the reporter would have said something like, "You need to give us a verbal reply, so the tape can pick this up." But this "transcript" is not a reporter's account of a court proceeding. It is simply a typed version of an audio tape recording of an officer interview of the defendant in his home, with no one else present. No one made a demand for audible responses, but it seems fairly clear that Pennycuff was communicating with his questioner. This is not only my reading of this typewritten account of the tape-recorded interview. It is precisely what the questioner, Detective Godan, said under oath in an affidavit filed in support of Pennycuff's belated motion to correct errors. *Pennycuff v. State*, 745 N.E.2d 804, 811 n. 7 (Ind.2001).

The majority acknowledges that defense counsel did not raise this fairly obvious response to the charge that Pennycuff was a liar. The majority concludes that there was no prejudice from this exchange because the jury could conclude either that

Pennycuff had "dissembled" or that he had refused to answer, both of which place him in a poor light. But the majority's characterization of "dissembling" responses is not the only alternative reading of this transcript. The point of Pennycuff's contention is that he did neither. He claims he was forthright and did respond to the questions. And he points to the fact that Detective Godan took his answers as denials. If so, he was cooperating, not dissembling. Similarly, his failure to recall not responding to the inquiries is consistent with his claim that he did in fact respond. Thus, the jury was presented with a defense that accepted the State's characterization of this exchange as Pennycuff's refusal to answer. Pennycuff's claim of truthful answers was for the jury to resolve, but it was presented or discussed by no one.

If counsel had read this "transcript" as I do, the contention would not be that there is a *Doyle* problem. Rather, the contention would be that the State was fabricating a refusal to answer when there was none. Accordingly, the contention would be that Pennycuff was truthful in claiming cooperation with the investigation. And his failure to recall "not responding" is explained by the fact that it did not occur. None of this was pointed out to the jury. In itself, that may be explained as a viable strategy based on factors not evident from the record. But I do not agree with the majority when it attributes counsel's performance to a "heat of battle" decision. Long before the trial began it must have been obvious that the transcript was clearly in play and a subject of dispute. In any event, the direct examination of Detective Godan plainly foreshadowed the prosecution's claim in closing argument that Pennycuff was not forthcoming.

Minimal preparation by trial counsel would have considered how to handle this

issue. If viewed as nonverbal negative responses, the defense could have presented Pennycuff's claim of cooperation as supported, not rebutted, by the "transcript," if not a *Doyle* violation. Perhaps rejection of that alternative was a tactical call based on counsel's assessment that the claim to have given nonverbal responses would not be accepted. But, for the reasons given by the Court of Appeals, counsel had to choose either that route or a *Doyle* objection, and did neither.

## II.

Regardless of the resolution of the issues raised by the transcript, in the context of the other actions of trial counsel, I think ineffective assistance was demonstrable. It was defense counsel, not the prosecution, who introduced the "X–Rated Stuff." This was after direct examination of the detective had concluded without mention of the nature of the literature seized in Pennycuff's house. I think it obvious that possession of some of these materials may have prejudiced some jurors against Pennycuff. The majority suggests that this subject was brought out "anticipating the State's redirect." I would think that its introduction would be highly improper unless it were itself illegal material, which no one seems to contend is the case. There was no need to anticipate an action by the prosecution that did not occur on direct, should not have occurred on redirect, and should not have been allowed by the trial court if it did.

After defense counsel had opened this subject, the prosecution offered the September 1996 issue of "Hawk," claiming to display, "The youngest babes allowed by law!" to rebut Pennycuff's claim that he was a law abiding citizen. This publication was not shown to T.P. or involved in any of the alleged incidents. Taking this magazine's claim at face value, it is not illegal.

Even if it contained photos of underage subjects, its relevance would be at best a marginal call under Evidence Rule 403. But it appears to contain nothing but photos of adult women. Whatever one thinks of this publication, it is of the genre openly displayed in many newsstands and other retail outlets. We claim to base our criminal justice system on proof of what the defendant has done, not who the defendant is. Yet introduction of the defendant's lawful materials, however tasteless, without tying them to any issue in the case runs the risk of violating that basic principle. The prosecutor's closing argument played to this theme. It included the contention that, "What's strange is that the Defendant had sex with his daughter. It's strange that he committed oral sex with his daughter. *It's strange that he's had barley [sic] legal magazines that he reads.*" (Emphasis added.) In short, introducing these materials was in my view not a defensible defense strategy, and it produced the erroneous admission of prejudicial materials.

The claim raised in this appeal is ineffective assistance for introducing this material into the trial, not trial court error in admitting the one item to which Pennycuff objected. The State defended its admission on the ground that defense counsel had opened the door by pointing out on cross-examination of Detective Godan that no photos or videos of T.P. were found in the search and that Pennycuff had no criminal record. The trial court, in ruling on Pennycuff's motion to correct error, found that it had ruled the materials admissible on that basis. In my view, if the door was not opened, overruling the objection was error, *see Rafferty v. State*, 610 N.E.2d 880, 883 (Ind.Ct.App.1993). It seems debatable that the door was opened wide enough to permit salacious but irrelevant material, but the issue is not raised in this appeal as trial court error. Rather, it

is presented as ineffective assistance for opening the door. I believe Pennycuff has established his claim of ineffective assistance by showing that the defense opened the door to materials that would otherwise have been ruled inadmissible.

Because this case turned substantially on the conflicting testimony of Pennycuff and T.P., the introduction of these materials was prejudicial. As the majority puts it, this "X–Rated Stuff" was used to show the defendant's interest in his own young daughter. *Pennycuff,* 745 N.E.2d 804 at 816. I think this use violates both prongs of the balancing test required by Evidence Rule 403. It is highly prejudicial, because many would find this magazine offensive or even, in the prosecutor's term, "strange." It is also irrelevant. The defendant's interest in photographs of somebody else's adult daughters is qualitatively different from the charge that he was having sex with his own fourteen year old. In any event, its appearance in this case was instigated by defense counsel and was prejudicial. I would deny transfer and accept the result of the Court of Appeals' decision.

DICKSON, J., concurs in Part I.