**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**JEFFREY A. BALDWIN**
Baldwin, Dakich & Maxwell
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ANGELA N. SANCHEZ**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| JAY UNGER, | ) | |
| | ) | |
| Appellant-Petitioner, | ) | |
| | ) | |
| vs. | ) | No. 67A01-1102-PC-32 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Respondent. | ) | |

APPEAL FROM THE PUTNAM CIRCUIT COURT
The Honorable Matthew L. Headley, Judge
Cause No. 67C01-0709-FB-124

February 8, 2012

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**BAKER, Judge**

Appellant-petitioner Jay Unger appeals the denial of his petition for post-conviction relief, claiming that his trial counsel was ineffective for a number of reasons, including the failure to object to the testimony of several witnesses, failing to object to instances of alleged prosecutorial misconduct, and failing to object to a final instruction that was given. Unger claims that the cumulative effect of those errors entitles him to post-conviction relief.

Unger also raises several issues on direct appeal, claiming there was insufficient evidence to support his convictions for Aggravated Battery,[1] a class B felony, and two counts of Battery,[2] a class B misdemeanor, and that the State failed to disprove his claim of self-defense. Unger also maintains that the trial court erred in ordering him to pay restitution because it did not adequately inquire into his ability to pay. Unger further claims that the trial court erred in calculating the amount of restitution that he purportedly owed and that it failed to fix the time and manner of payment.

The State cross-appeals claiming that we should dismiss Unger's post-conviction portion of the appeal because a timely notice of appeal had not been filed.

We conclude that the post-conviction court properly denied Unger's request for relief, and further find that that the evidence was sufficient to support the convictions. We also conclude that the trial court properly inquired into Unger's ability to pay restitution, but we remand this cause to the trial court with instructions that it determine

---

[1] Ind. Code § 35-42-2-1.5.

[2] I.C. § 35-42-2-1.

2

the amount of restitution, if any, that Unger has not yet paid, and to fix the manner of payment.

## FACTS

During the fall of 2007, Unger and his sisters—Gene Anne and Mary Jane Mace—and their families were living on or near the family farm in Putnam County. Mary Jane and her husband, Jack Mace, lived in a house on the farm that was a short distance from a trailer where Unger's son, Jared, lived.

On September 9, 2007, Gene Anne was upset that Unger and Jared had moved an old truck on the property and piled some junk into it. Gene Anne wanted the truck moved back to its original spot and the junk removed.

At some point, Gene Anne left a voicemail for Unger, demanding that he move the truck and fix the problem within two weeks. Thereafter, Gene Anne drove to the farm and told Jared to move the truck. Following a verbal disagreement with Jared, Gene Anne left his trailer and walked over to the Maces' residence. She wanted to give them a "heads up" about the situation with Jared because "if you didn't handle a conversation correctly the conversation [with Jared] could become very volatile." Tr. p. 275. In the meantime, Jared called Unger and told him about the conversation.

Unger arrived at the farm approximately fifteen minutes later. He seemed upset and he and Jared walked over to the Maces' house. Gene Anne and Mary Jane came outside and stood on a porch. Gene Anne and Unger argued about the truck, and while they were talking, Unger moved closer to Gene Anne until they were nearly "face-to-

3

face." Tr. p. 142, 281-82. Unger became angry and was "spitting and sputtering" as he spoke. Id. at 142. Mary Jane touched Unger's chest and ordered him to "back up." Id. at 142, 282, 312. In response, Unger struck Mary Jane across the face knocking her off the porch onto the ground. Gene Anne screamed "holy sh*t," and Unger turned and punched her in the face with his fist. Id. at 282, 312. As a result, Gene Anne was knocked to the ground.

Jack was lying on the couch inside the house and could hear the yelling outside. He then saw Mary Jane pass the window as she was knocked to the ground. Jack ran to the laundry room, put on some shorts and boots, and ran from the house through the garage. When Jack stuck his head out from the rising garage door, he saw both women on the ground. Unger was standing over the top of Gene Anne, who was on her hands and knees. Unger continued to strike her on the back of her head and neck area. Because Jared was also present and the two of them had physically confronted Jack in the past, Jack stepped back into the garage and grabbed a baseball bat.

Jack ran from the garage with the bat and yelled for Unger and Jared to "clear out." Tr. p. 368. Jack ran to the porch and continued to yell for Unger and Jared to leave. Unger turned and rushed toward Jack. Unger raised his hands in the air and swung his foot to kick at Jack. In response, Jack struck Unger on his lower left side with the bat. Jared then ran from behind Unger and tackled Jack, knocking him backwards into the porch rail. The tackle twisted Jack's leg that caused injuries to his ankles and

4

knee because his foot was caught in a crevice. Jack was then propelled into a pipe handrail on the porch that cracked one of his ribs.

Jared dragged Jack from the porch and pinned him to the ground, face down. Gene Anne and Mary Jane repeatedly tried to pull Unger and Jared off of Jack. The men repeatedly pushed Mary Jane and Gene Anne off of them. Gene Anne eventually began to scream, "you're going to kill him. You're going to kill him." Tr. p. 152, 289.

Mary Jane eventually managed to pull Jared back enough that enabled Jack to crawl from beneath him. Jack grabbed a metal plant hanger—or shepherd's hook—from the nearby flower bed and used it to help him stand up. Unger grabbed the baseball bat from the ground and hit Jack in the side of the head with it. The impact made a sound that "popped like a melon." Id. at 152, 287. Jack began to stumble and lost his balance. Unger and Jared then took the bat, returned to Unger's truck, and left the premises.

Jack was bleeding from his ears and nose and started to vomit. He was eventually transported by Lifeline helicopter to Methodist Hospital in Indianapolis. It was subsequently determined that Jack's skull was fractured in multiple places. The fractures extended from the area of impact to the skull base, the bottom of the ear canal, the bony portion of his middle ear and into the middle ear, the bottom of his eye, and his jaw socket. Jack also hemorrhaged on the other side of his brain that was caused by the brain being propelled to the opposite side of the skull by the blow.

As a result of his injuries, Jack suffers significant hearing loss and balance problems. He has lost his peripheral vision and is unable to drive at night. Additionally,

5

Jack's eyes no longer move in coordination with the movement of his head, he cannot climb, and he has difficulty balancing on uneven surfaces. Jack's injuries have rendered him unable to continue most of his work as a construction contractor and he lost his job at UPS because the company could not find an alternate position that could accommodate his physical limitations.

The State charged Unger with Count I, aggravated battery, a class B felony, for the offense against Jack; two counts of battery, a class B misdemeanor, that involved the altercation with Gene Ann and Mary Jane, battery with a deadly weapon, a class C felony, and criminal recklessness, a class D felony, both of which involved the offenses against Jack.

Following a three-day jury trial, Unger was found guilty as charged on December 19, 2008. At the sentencing hearing that commenced on February 16, 2009, the trial court merged the battery by means of a deadly weapon and criminal recklessness counts with the aggravated battery charge that was alleged in Count I. The trial sentenced Unger to seven years on Count I, with one year suspended. Unger was ordered to serve one year on probation following his release from incarceration. The trial court also sentenced Unger to six months, suspended, on the remaining battery counts, with those sentences to run consecutive to the sentence that was imposed in Count I. Finally, Unger was ordered to pay restitution in the amount of $46,646.21, which included medical expenses and payment for lost wages.

6

On March 11, 2009, Unger filed a notice of appeal and subsequently received permission to file a petition for post-conviction relief. Thereafter, on May 6, 2009, we dismissed Unger's direct appeal without prejudice. We ordered Unger, upon issuance of a final order from the trial court, to file a new notice of appeal "to restart the appellate process." Appellant's App. p. 423-24.

On June 26, 2009, Unger filed a verified petition for post-conviction relief, claiming that his trial counsel was ineffective for failing to object to the testimony of various witnesses and to evidentiary items that the State introduced at trial. Unger further claimed that his counsel was ineffective because there was no objection to the prosecutor's alleged improper comments that were made during closing argument and to a self-defense instruction that the trial court gave.

On December 6, 2010, a hearing commenced on Unger's petition for post-conviction relief. At some point during the hearing, Unger requested the trial court to recognize attorney Kevin McShane as an expert witness. Although the post-conviction court initially agreed to do so, it permitted the prosecutor to ask some additional questions. At that point, the prosecutor questioned McShane about practicing law in Putnam County. In response, McShane testified that he had, in fact, tried cases there. McShane was then asked about whether he was familiar with prevailing professional norms in that county. Following Unger's objection to the question, the deputy prosecutor explained that:

> Well Judge one of the elements of this thing is whether or not the representation of counsel came up to the prevailing standards of reasonableness here and you know if it's the same in Putnam County as it is in Gary, Indiana fine then he can testify as to that. But unless he can testify as he's qualified to make a judgment on that, then he's not an expert here.

Tr. p. 63-66. The trial judge then declined to qualify McShane as an expert.

On January 4, 2011, the post-conviction court entered findings of fact and conclusions of law, denying Unger's request for relief. More particularly, the post-conviction court found that trial counsel met with Unger at least thirty times to discuss and analyze the case. Moreover, the post-conviction court recognized that Unger's counsel has over thirty years of experience in criminal defense, he took depositions in the case, and advised Unger to seek a second opinion about the case before proceeding to trial.

The post-conviction court concluded that

[Defense Counsel] obviously knew that the undisputed facts were that [Unger] battered both his sisters and that one of the sisters husband (victim) came out with a bat to protect his wife. [Defense Counsel] also knew it was a two on one fight (Defendant and his son versus victim). He is in rural Indiana where he knows that when a man's wife is injured, the expected action (whether right or not) is to defend your spouse.

[Unger] fails to meet his burden on the first part of the test. He is not entitled to a perfect trial. He surprised his own lawyer with the central piece of evidence by saying for the first time that the weapon used was not the one presented at trial. Even if [defense counsel] had done the things that Attorney McShane believes he should have, the conduct must be shown to prejudice the Defendant to the point that the outcome would have changed. The evidence was overwhelming that [Unger] did strike the victim with a baseball bat to the head. It is not uncommon for a victim to testify as to his own injuries. It is not uncommon for certain questions

answered and statements given that an attorney must analyze in a split second and decide whether or not should draw attention to the remark (so as to "ring the bell twice") or let it pass. Here, [Unger] has not shown but for the attorney's perceived errors, the outcome would have been different.

Appellant's App. p. 489.

Thirty-one days later, on February 4, 2011, Unger filed his Notice of Appeal. Then, on March 16, 2011, we ordered Unger to show cause why the appeal of his denial for post-conviction relief should not be dismissed because his notice of appeal was not filed in a timely manner. However, we ultimately discharged the prior order to show cause and Unger timely filed his appellate brief pursuant to our directive.

On June 15, 2011, the State filed a motion to dismiss the post-conviction portion of Unger's appeal for lack of jurisdiction and, in the alternative, a motion to compel a conforming appendix. On August 19, 2011, we held the State's motion to dismiss in abeyance to be addressed by the writing panel assigned to the case, but granted the State's motion to compel a conforming appendix. Thereafter, Unger filed his amended appendix and appeals the denial of his petition for post-conviction relief and presents additional issues on direct appeal. For the reasons discussed below, we now deny the State's motion to dismiss Unger's post-conviction relief issues.

## DISCUSSION AND DECISION

### I. State's Cross-Appeal

We first address the State's cross-appeal. The State argues that we should dismiss the post-conviction portion of Unger's appeal because he did not file a notice of appeal

9

within thirty days, following the denial of his petition for post-conviction relief. The State maintains that there is no mechanism permitting a belated appeal from the post-conviction relief proceedings and, therefore, the State contends that we lack jurisdiction to hear the post-conviction portion on appeal.

Notwithstanding these contentions, we note that Unger had no notice of the trial court's ruling until counsel received the order in the mail. Here, Unger filed his notice of appeal on February 4, 2011, which was one day late through no fault of his own. Our Supreme Court has determined that we have the discretionary power to entertain an appeal after the time allowed has expired. Lugar v. State, 270 Ind. 45, 46-47, 383 N.E.2d 287, 289 (Ind. 1978). In our view, dismissing this case—as the State would have us do—would defeat, rather than promote, the ends of justice. More particularly, it is apparent that the post-conviction court may have drawn a distinction between Putnam County and the remaining Indiana counties regarding the standard of reasonableness regarding attorney representation. We are concerned with the statement that the incident occurred in "rural Indiana where he knows that when a man's wife is injured, the expected action (whether right or not) is to defend your spouse." Appellant's App. p. 488. In our view, the post-conviction court erred when it indicated that it might consider its county different than the rest of the State with regard to prevailing professional norms of an attorney and is a matter of public concern. Thus, we opt to dispose of Unger's post-conviction claims on their merits.

## II. Unger's Post-Conviction Claims

Unger initially contends that he is entitled to post-conviction relief because the post-conviction court improperly evaluated trial counsel's performance according to particular Putnam County community standards rather than statewide standards. Unger also asserts that he is entitled to relief because of counsel's failure to object to the State's motion to amend the charging information, that he did not adequately explain the terms of a proposed plea agreement, that he improperly stipulated to the admission of an exhibit that was alleged to be a weapon during the altercation, and he failed to object to expert and other witness testimony. Unger further contends that his counsel should have moved for a directed verdict, and objected to a final instruction on self-defense that was given and to three alleged instances of prosecutorial misconduct.

As discussed above, the post-conviction court refused to deem McShane an expert witness because McShane may not have been qualified to testify about the prevailing professional norms in Putnam County. In essence, the post-conviction court was suggesting that the standards in Putnam County were somehow different than the prevailing professional norms that exist elsewhere in the State.

We cannot agree with the State's assertion that the post-conviction court was merely explaining the difficulty that trial counsel faced in persuading a jury that Unger acted in self-defense because of the predispositions or expectations that jurors may have based on local social or cultural norms. Simply put, the Rules of Professional Conduct

11

apply to each attorney throughout the State and there is no differentiation among the various counties.

That being said, while the post-conviction court might have improperly differentiated with regard to prevailing professional norms, we will address Unger's claims of ineffective assistance of counsel on their merits, according to the prevailing professional norms in this State.

### A.  Standard of Review—Generally; Post-Conviction Relief

A post-conviction petitioner has the burden of establishing the grounds for relief by a preponderance of the evidence.  Ind. Post-Conviction Rule 1(5); Ben-Yisrayl v. State, 738 N.E.2d 253, 258 (Ind. 2000).  A petitioner who has been denied post-conviction relief is in the position of appealing from a negative judgment.  Id. Thus, the petitioner faces a "rigorous standard of review" on appeal.  Dewitt v. State, 755 N.E.2d 167, 170 (Ind. 2001).

The post-conviction court's denial of relief will be affirmed unless the petition shows that the evidence leads "unerringly and unmistakably to a decision opposite that reached by the post conviction court."  McCary v. State, 761 N.E.2d 389, 391 (Ind. 2002).  In reviewing the denial of post-conviction relief, we do not reweigh the evidence or judge the credibility of the witnesses.  Rather, we consider only the evidence and reasonable inferences from the evidence that supports the judgment of the post-conviction court.  See Bahm v. State, 789 N.E.2d 50, 57 (Ind. Ct App. 2003).

12

B.  Ineffective Assistance of Counsel Claims

In addressing Unger's claims of ineffective assistance of counsel, we note that the standard in evaluating such claims is straightforward.  In particular, reversal for ineffective assistance of counsel is appropriate in cases where a defendant shows both that counsel's performance fell below an objective standard of reasonableness and that said deficient performance so prejudiced the defendant as to deprive him of a fair trial. Pennycuff v. State, 745 N.E.2d 804, 811 (Ind. 2001) (citing Strickland v. Washington, 466 U.S. 668, 697 (1984)).  It is strongly presumed that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.  Pennycuff, 745 N.E.2d at 811.  Judicial scrutiny of counsel's performance is highly deferential. Id. Isolated poor strategy, inexperience, or bad tactics do not necessarily amount to ineffectiveness of counsel. Id.  If deficient performance of counsel can be proven, the defendant must also show a reasonable probability that it altered the outcome of the case. Id.  Additionally, to prove ineffective assistance of counsel from the failure to object, the defendant must prove that an objection would have been sustained, that the failure to object was unreasonable, and that prejudice resulted. Potter v. State, 684 N.E.2d 1127, 1134 (Ind. 1997).

When evaluating ineffective assistance of counsel claims, courts must be cognizant of the fact that there are countless ways to provide effective assistance in any given case.  Pennycuff, 745 N.E.2d at 812. Even the best criminal defense attorneys would not defend a particular client in the same way.  Id. (citing Strickland, 466 U.S. at

13

689).   When reviewing claims of ineffective assistance of counsel, we judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.  Id.   Finally, we note that while errors by counsel that are not individually sufficient to prove ineffective representation may add up to ineffective assistance when viewed cumulatively, counsel's performance must be evaluated as a whole.  Lemond v. State, 878 N.E.2d 384, 391 (Ind. Ct. App. 2007).

We turn first to Unger's claim that his trial counsel failed to adequately explain a proposed plea agreement dated October 6, 2008, to him because he did not fully understand the meaning of suspendable and nonsuspendable offenses.  Unger claims that if his trial counsel would have more fully explained the terms of the agreement to him, he would have accepted it.

Notwithstanding Unger's contention, trial counsel testified at the post-conviction hearing that he faxed the plea offer to Unger, explained the terms of the agreement to him in detail, and discussed it with him on several occasions.  Tr. p. 7-8, 10.  Moreover, counsel unequivocally testified that he fully explained the differences about suspendable and nonsuspendable offenses to Unger because that had been a concern to Unger very early in the case.  Id. at 8-9.  In essence, the evidence supports the post-conviction court's conclusion that it credited defense counsel's testimony and rejected Unger's contentions.  Therefore, Unger does not prevail on his claim of ineffective assistance of trial counsel on this basis.

14

Unger also contends that his trial counsel was ineffective for failing to object to the amendment of the charging information approximately one week prior to trial. We note that the State is permitted to make an amendment to a matter of substance at any time before the commencement of trial so long as the amendment does not prejudice the defendant's substantial rights. Ind. Code § 35-34-1-5(b). A defendant's substantial rights include a right to sufficient notice and an opportunity to be heard regarding the charge. Ramon v. State, 888 N.E.2d 244, 252 (Ind. Ct. App. 2008).

In this case, the State amended the charging information alleging the offense of aggravated battery, a class B felony, in Count I. More particularly, the charge originally alleged that Unger "created a substantial risk of death" to Jack as the result of his actions. However, the amended charge alleged that Unger "caused protracted loss or impairment of the function of a bodily member or organ." Appellant's App. p. 25.

The amendment did not change the crime, class of offense, the potential punishment, or the evidence that the State was going to present against Unger. Tr. p. 13-16, 39. In fact, the only difference was the harm used to enhance the crime to a class B felony, which changed from a substantial risk of death to an actual protracted impairment of a bodily member or organ. Trial counsel was prepared to address the medical evidence under either theory, and there was still a week to finalize the theory of defense. Id. at 13, 39-40. Moreover, after trial counsel explained that a continuance would likely result from an objection, Unger made it clear that he did not want the trial continued. Tr. p. 13.

15

For these reasons, we conclude that trial counsel was not ineffective for not objecting to the amendment of the charging information.

Unger also contends that trial counsel was ineffective for not objecting to the admission of a metal plant hanger admitted into evidence that was allegedly used during the altercation. Unger argues that stipulating to the admission of the hanger eliminated the need for the State to establish chain of custody, and it cast doubt on both Unger's and Jared's testimony when they testified that the plant hanger was not the same one that was actually used in the altercation.

At trial, Unger and his son testified that the plant hanger admitted into evidence was similar to the one that was used during the fight. However, they asserted that the actual item that was used was one or two feet longer. Tr. p. 467, 474, 523, 543-44, 546.

Trial counsel testified that this was inconsistent with what he had been told prior to trial. Id. at 17-19. The record shows that before the trial commenced, Unger viewed the plant hanger and stated that he was "not sure" if it was the same one used in the fight. Id. at 17-18. Trial counsel testified that he had not been informed prior to trial that the plant hanger was not the same one, and that Unger and his son's testimony at the post-conviction hearing was inconsistent with what he had been told before the trial.

Given these circumstances, Unger's counsel had no reason to expect that the identity of the exhibit would be challenged at trial. Moreover, it is apparent that trial counsel made a reasonable strategic decision based on the information available to him at the time to stipulate to the admissibility of the plant hanger. Indeed, stipulations are

16

looked upon with favor as a means of simplifying and expending litigation. <u>Gann v. State</u>, 570 N.E.2d 976, 978 (Ind. Ct. App. 1991). And the decision to stipulate to the admission of evidence has been considered a matter of trial strategy. <u>Id.</u>

We also note that while Unger's counsel stipulated to the admissibility of the exhibit, there was no factual stipulation appearing in the record establishing that the plant hanger was the same one used in the fight. <u>Id.</u> at 149-50, 473-74, 544-45. In fact, when the prosecutor characterized the stipulation as such, Unger's counsel objected and requested the trial court to admonish the jury. <u>Id.</u> at 544-45. Even more compelling, Jack, who was the owner of the plant hanger, testified that it was, in fact, the same one that was used in the fight. <u>Id.</u> at 400, 523, 543-44, 546. Thus, the plant hanger may very well have been admitted into evidence with or without the stipulation.

In any event, it is our view that whether or not the hanger that was admitted into evidence was precisely the same instrumentality that was used in the altercation was of little relevance, when considering the ultimate question in the case. Indeed, the critical issue was with regard to how and when Jack wielded the hanger relative to Unger striking him in the head. And the precise size of the plant hanger does not alter that question. In short, Unger has failed to show that his trial counsel was ineffective when stipulating to the admission of the plant hanger into evidence.

Unger also asserts that trial counsel was ineffective because there was no objection to the allegedly improper expert testimony that the emergency room physician offered

17

after stating that she was not an expert on hearing loss but, nonetheless, offered testimony regarding Jack's inability to hear.

At trial, the emergency room physician testified about Jack's actual injuries, including damage to his ear. However, she did not testify that Jack suffered any hearing loss as a result of those injuries. Tr. 336-41, 345, 352. The doctor clearly testified that she had limited expertise in hearing loss, could not say whether Jack's injuries were likely to cause hearing loss, and provided only general testimony that hearing loss could possibly result from injuries similar to Jack's. Id. at 341-43, 345-46, 352.

Defense counsel clarified during cross-examination that the physician had no knowledge of Jack's actual condition. Furthermore, Jack and his wife both testified about the level of his hearing loss and other forms of impairment that he sustained in the fight. Tr. p. 157-58, 357-60, 383. In the end, Unger has failed to establish either that an objection would have been sustained had one been made, or that he was prejudiced by the testimony.

Unger next contends that trial counsel was ineffective for failing to move for a directed verdict at the close of the State's case. As Unger acknowledges, a directed verdict is appropriate if there is a total absence of evidence as to the guilt of the accused or where there is no conflict in the evidence, and it is susceptible only to an inference in favor of the accused. Cutter v. State, 725 N.E.2d 401, 407 (Ind. 2000). To survive the motion, the State need only present some evidence supporting each element of the offense. Id.

18

In this case, defense counsel testified that he did not move for a directed verdict because he did not believe that such a "pointless exercise" was worth risking the "wrath of the trial court," which had previously occurred. Tr. p. 26-28. And the record clearly reflects that the State presented sufficient evidence to withstand the motion had it been made.

There was no dispute that Unger struck each of the three victims. Rather, the only issue was whether he did so in self-defense. Additionally, Jack, his wife, and his physician testified as to the severity of his injuries and the resulting impairment to his hearing, balance, vision, and ability to function in general. Id. at 156-58, 357-59, 336-37. In light of this evidence, Unger has failed to show that his trial counsel was ineffective in not moving for a directed verdict.

Unger next claims that trial counsel was ineffective for failing to object to Jack's testimony about the diagnosis of his injuries because it amounted to inadmissible hearsay evidence. Unger asserts that trial counsel should have objected to Jack's testimony that he had been diagnosed with "bilateral vestibular opathy," and the additional explanation of what the ailment was and what the effects of it were. Tr. p. 359-60.

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Ind. Evidence Rule 801(c). To prove ineffective assistance of counsel from the failure to object to hearsay statements, Unger must prove that an objection would have been sustained, that the failure to object was unreasonable, and that he was prejudiced. Potter,

19

684 N.E.2d at 1134. Finally, we note that hearsay statements made by one witness are not prejudicial if the original declarant testifies to the same statements because the statements are then subject to cross-examination. Id.

Unger's trial counsel explained that he did not object to Jack's testimony on the grounds of hearsay for several reasons. First, he correctly observes that Jack did not testify that a physician had provided him with the diagnosis. Rather, the diagnosis was merely cumulative of the description of the injuries in Jack's testimony and the medical records. It is certainly not unusual for an individual to know the name and nature of his or her own medical condition, and the injuries here were not the critical aspect of this case. Instead, the central issue was whether Unger acted in self-defense, and trial counsel believed from his experience that the "shotgun" approach of challenging each and every potential issue could detract from the effectiveness of the self-defense claim. Tr. 23-25. In our view, that was a matter of strategy. Moreover, Unger has not shown any prejudice resulting from the decision not to object because Jack's testimony was merely cumulative of other evidence that established the nature and severity of the injuries. Thus, Unger's claim of ineffective assistance of trial counsel on this basis fails.

Unger next argues that he is entitled to post-conviction relief because his trial counsel failed to object to multiple improper comments that the prosecutor made during closing argument. To prove prosecutorial misconduct, a defendant must show first, that the prosecutor engaged in misconduct and second, that misconduct put the defendant in a position of grave peril. Carter v. State, 738 N.E.2d 665, 676-78 (Ind. 2000). Failing to

20

object to the prosecutor's comments waived any error. Once waived, the issue warrants reversal only if it amounts to fundamental error. Id.

Unger first claims that during cross-examination, the prosecutor inappropriately "editorialzed" during Unger's cross-examination that Unger "then hit [Jack] in the head with a baseball bat," after striking him with the plant hanger. Tr. p. 44. Although another attorney who was sitting in the court room that day testified that he heard the remark, the prosecutor's alleged statement does not appear in the transcript. Id. Moreover, even assuming that some type of comment was made, there is no evidence establishing that trial counsel or the jury heard it. It cannot be said that Unger's counsel should have objected to something that he did not know about. Moreover, Unger could not have been prejudiced by something that the jury did not hear. Hence, Unger has failed to show that his trial counsel was ineffective for not objecting to a comment that the prosecutor might have made.

Unger next contends that his counsel was ineffective for failing to object to the prosecutor's alleged misstatements of the law that were made during closing argument. Unger contends that the prosecutor misstated the law because he suggested that Unger had a legal duty to retreat from the fight by pointing out the numerous opportunities that Unger had to withdraw from the fight.

We cannot say that such comments were improper. Indeed, the State's theory of the case was that Unger was the aggressor or at least a mutual combatant. Thus, Unger had a duty to withdraw before he was privileged to strike anyone in self-defense. See

21

Wilson v. State, 770 N.E.2d 799, 801 (Ind. 2002) (holding that a mutual combatant, whether or not the initial aggressor, must declare an armistice before he or she may claim self-defense). During rebuttal, the prosecutor specifically explained that such was his point in commenting on Unger's opportunities to withdraw. Tr. p. 586-87. That said, an objection to the prosecutor's comments would not likely have been sustained.

Moreover, the jury was completely and accurately instructed both that a person does not have a duty to retreat if they are otherwise eligible to act in self-defense and that a mutual combatant has the duty to withdraw and communicate the withdraw. Appellant's App. p. 351; tr. p. 595-96. Therefore, even if it could be said that the prosecutor's comments were improper, any error on this issue was cured by the instructions. Thus, Unger's claim of ineffective assistance of counsel on this issue fails.

Unger next maintains that his trial counsel was ineffective because he failed to object to improper statements made by the prosecutor because they suggested his personal knowledge of the case. More specifically, Unger claims that the following remark to the jury was improper: "My initial impression of them was that the father is a bully and then he raised a bully." Tr. p. 560.

Notwithstanding Unger's contention, our Supreme Court has determined that the prosecutor does not commit misconduct or expose the defendant to grave peril merely by using colorful language, disparaging characterizations of the defendant, or provocative appeals to the jury, especially where that language is supported by the specific circumstances of the case or the evidence that is presented. See Cooper v. State, 854

22

N.E.2d 831, 836-37 (Ind. 2006) (finding no misconduct when the prosecutor stated that the defendant was a "back shooter and a woman beater" and a "liar" because those statements were fair characterizations of the evidence); Brennan v. State, 639 N.E.2d 649, 652-53 (Ind. 1994) (rejecting the claim that counsel was ineffective for not objecting when the prosecutor referred to the defendant as "a cold-blooded killer" during argument).

In addition to the conduct that occurred in this case, there was evidence of a prior confrontation between Jack, Unger, and his son, that could be described as bullying-type behavior on the part of Unger. Tr. p. 372-75, 485, 512-13. That said, the prosecutor's comment was supported by the evidence and it fit fairly within the State's overall theory of the incident. Moreover, trial counsel acknowledged that he initially intended to object to the comment but decided not to draw additional attention to it because the remark was not so far beyond a fair characterization of the evidence to warrant such action. Tr. p. 30-31. In our view, defense counsel made a reasonable strategic decision not to object to the prosecutor's comment. Thus, Unger's claim of ineffective assistance of counsel fails on this basis.

Finally, Unger claims that he is entitled to post-conviction relief because trial counsel failed to object to one of the final instructions. More specifically, Unger contends that the following instruction misstated the law and trial counsel should have objected to it:

23

> When the Defendant claims self-defense, he must prove these three facts. That he was in a place he had a right to be. Two that he acted without fault. Three and that he had a reasonable fear or apprehension of death or great bodily harm. Once self-defense has been asserted, the State may overcome the burden by showing the absence of any one of those elements beyond a reasonable doubt.

Tr. p. 595-96.

Unger claims that his counsel should have objected to the instruction because it, among other things, does not contain any language regarding the defendant's duty to retreat if he is not the initial aggressor. Tr. p. 70. Notwithstanding Unger's contention, we note that the trial court gave an additional instruction that contained complete and accurate explanations as to when an individual must retreat or withdraw. Appellant's App. p. 351. More specifically, the instruction provided in its entirety that:

> It is an issue whether the Defendant acted in self-defense, (or defense of another person).
>
> A person may use reasonable force against another person to protect himself from what he reasonably believes to be the imminent use of unlawful force.
>
> A person is justified in using deadly force, and does not have a duty to retreat, only if he reasonably believes that deadly force is necessary to prevent serious bodily injury to himself or a third person or to prevent the commission of a felony.
>
> However, a person may not use force if:
>
> He is committing a crime that is directly and immediately connected to the confrontation.
>
> He is escaping after the commission of a crime that is directly and immediately connected to the confrontation.

24

He provokes a fight with another person with intent to cause bodily injury to that person.

He has willingly entered into a fight with another person or started to fight, unless he withdraws from the fight and communicates to the other person his intent to withdraw and the other person nevertheless continues or threatens to continue the fight.

The State has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense.

Appellant's App. p. 351.

The instruction above supplements the one that Unger is complaining about. Moreover, it points out that once self-defense is raised, the burden shifts to the State to disprove one of the elements. Id. at 352. Therefore, when the instructions are read together, they accurately informed the jury of the law. As a result, Unger's claim that his trial counsel was ineffective for failing to object to the self-defense instruction fails.

In sum, although Unger has presented several alleged instances of ineffective assistance of counsel, he has failed to show any unreasonable or deficient performance with regard to these claims. In fact, the record demonstrates that Unger received thorough and effective representation by an attorney with over thirty years of experience Tr. p. 5, 37, 38. The record shows that defense counsel met with Unger nearly thirty times before trial, deposed witnesses, advised Unger to seek a second opinion about the case, subjected the State's witnesses to vigorous challenges at trial, and generally gave Unger the time and attention well beyond the normal standards of pretrial preparation. Tr. p. 8, 20, 37, 38. As a result, we conclude that the post-conviction court correctly

25

determined that Unger's trial counsel was not ineffective nor was Unger prejudiced in any manner by counsel's performance. Thus, the post-conviction court properly denied Unger's request for relief.

### III. Direct Appeal Issues

### A. Sufficiency of the Evidence

Unger initially claims on direct appeal that the evidence was insufficient to support his convictions. Specifically, Unger maintains that he acted in self-defense and the State failed to disprove his self-defense claims beyond a reasonable doubt.

When considering challenges to the sufficiency of the evidence, we neither reweigh the evidence nor judge the credibility of witnesses. Drane v. State, 867 N.E.2d 144, 146 (Ind. 2007). We consider only the probative evidence and reasonable inferences that support the verdict. Id. Conflicting evidence must be considered in the light most favorable to the trial court's ruling, and we will affirm the conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. Id. at 146-47. Sufficient evidence exists if a reasonable inference in support of the verdict may be drawn from the evidence. Id.

Here, it is not disputed that Unger struck the victims and hit Jack in the head with a baseball bat. The only issue was whether Unger acted in self-defense. To prevail on a self-defense claim, Unger was obligated to show that: 1) he was in a place he had a right to be; 2) he acted without fault; and 3) he was in reasonable fear or apprehension of bodily harm. Henson v. State, 786 N.E.2d 274, 277 (Ind. 2003). Once a claim of self-

defense is raised, the State must disprove at least one of the elements of self-defense beyond a reasonable doubt. Sanders v. State, 704 N.E.2d 119, 123 (Ind. 1999). The State can meet this burden by rebutting the defense directly, by affirmatively showing that the defendant did not act in self-defense, or by relying on the evidence presented in its case-in-chief. Miller v. State, 720 N.E.2d 696, 700 (Ind. 1999). Whether the State has met its burden is a question of fact for the fact-finder. Id.

We also note that when determining whether the State negated the defendant's claim of self-defense beyond a reasonable doubt, the standard of review is the same as in any other challenge to the sufficiency of the evidence. Randolph v. State, 755 N.E.2d 572, 576 (Ind. 2001). If a defendant is convicted despite his claim of self-defense, we will reverse only if no reasonable person could say that self-defense was negated by the State beyond a reasonable doubt. Wilson v. State, 770 N.E.2d 799, 800-01 (Ind. 2002).

Here, the evidence established that Unger was, at a minimum, a mutual combatant. And his self-defense claim requires that he did not provoke, instigate, or participate willingly in the violence. Driver v. State, 760 N.E.2d 611, 612 (Ind. 2002). Indeed, a mutual combatant, whether or not the initial aggressor, must declare an armistice before he or she may claim self-defense. Wilson, 770 N.E.2d at 801; see also Indiana Code § 35-41-3-2(e)(3) (stating that a person is not justified in using force if the person has entered into combat with another person or is the initial aggressor, unless the person withdraws from the encounter and communicates to the other person the intent

27

to do so and the other person nevertheless continues or threatens to continue unlawful action).

In his own written statement to the police, Unger described his action of striking Mary Jane as "retaliatory." Trial Ex. 8. And the evidence establishes that Mary Jane had merely placed her hands on Unger's chest and ordered him to back up. Tr. p. 282, 312. When Gene Anne cried out in response to Unger slapping and knocking down Mary Jane, he punched her in the face and also knocked her down. Id. at 282, 312. Mary Jane and Gene Anne were both small women, and Unger admitted that he was not scared of either of them. Id. at 142, 290, 540, 549.

Also, even had Mary Jane been the initial aggressor, the record supports the conclusion that Unger's response was completely disproportionate to Mary Jane's actions and was not motivated by the fear that she would cause him bodily harm. Likewise, the record supports the conclusion that Unger struck Gene Anne without provocation. As a result, Unger did not act in self-defense. In other words, because the record demonstrates that Unger provoked, escalated, and willingly participated in the violence, he had a duty to withdraw and announce his intention to do so before he was privileged to use force.

The record also demonstrates that Jack came outside to help his wife and sister-in-law. Jack testified that when he stepped outside, he saw both women on the ground and Unger standing over top of Gene Anne striking her on the back of her head or neck. Tr. p. 146-47, 368. In light of these circumstances, Jack was privileged to intercede and use reasonable force to defend the women to the same extent as he would himself. See I.C. §

28

35-41-3-2(a) (providing same standard and privilege for acting in defense of self or a third person).

Jack grabbed the baseball bat before running out of the garage and stood on the porch and yelled at Unger and his son to leave. Tr. p. 368, 372-75, 376. However, rather than retreating, the evidence showed that Unger appeared "enraged," rushed towards Jack, raised his hands, and started to kick toward Jack. Id. at 368. In defense, Jack struck Unger in the side with the bat and Unger's son then tackled Jack, pinning him to the ground. Tr. p. 368-69. A fight ensued with Unger and his son on top of Jack, who remained pinned to the ground. Id. at 149-50, 285-86, 289, 369-70.

At a minimum, the evidence showed that Unger was a willing participant and mutual combatant when he hit Jack in the head with the bat. Unger did not withdraw from the fight and he did not announce any intention to do so. Furthermore, when viewed in the light most favorable to the verdict, the evidence showed that Unger struck Jack while Jack was attempting to stand. Hence, Jack could not have reasonably posed an imminent threat of harm to Unger. Tr. p. 286, 370.

In light of this evidence, it is apparent that Unger is inviting us to credit his version of events over the accounts of the several other witnesses, which we decline to do. Put another way, we find that the State properly negated Unger's theory of self-defense beyond a reasonable doubt. Thus, we conclude that the jury's verdict was supported by substantial evidence of probative value and we decline to set aside Unger's convictions.

29

## B.  Restitution

Finally, Unger claims that the trial court erred in ordering him to pay restitution because there was no determination regarding his ability to pay and that the calculation of the amount he should pay is erroneous.  Unger also asserts that the trial court failed to fix the manner and time of the restitution payments.

Indiana Code section 35-50-5-3 affords the trial court broad authority to order restitution to the victim of a felony or misdemeanor.  Restitution is a matter within the sound discretion of the trial court and will be reversed only upon a finding of abuse of discretion.  Ault v. State, 705 N.E.2d 1078, 1081 (Ind. Ct. App. 1999). An abuse of discretion occurs if the court's decision is clearly against the logic and effect of the facts and circumstances before it.  Palmer v. State, 704 N.E.2d 124, 127 (Ind. 1999).  The purpose of a restitution order is to impress upon the convicted defendant the magnitude of the victim's loss and to defray costs to the victim because of the defendant's criminal actions.  Henderson v. State, 848 N.E.2d 341, 346 (Ind. Ct. App. 2006).

A trial court may impose restitution as a condition of probation. Ind. Code § 35-38-2-2.3(a)(5).  When the court does so, it must inquire into the defendant's ability to pay in order to prevent indigent defendants from being imprisoned because of their inability to pay. See id.; Walsman v. State, 855 N.E.2d 645, 654 (Ind. Ct. App. 2006).  When making this inquiry, the trial court considers factors including the defendant's current

30

financial status, health, and employment history. Champlain v. State, 717 N.E.2d 567, 570 (Ind. 1999). The trial court may conduct a proper inquiry of the defendant's ability to pay by reviewing presentence investigation reports (PSI) and /or considering the testimony of witnesses. Antcliff v. State, 688 N.E.2d 166, 170-71 (Ind. Ct. App. 1997).

Although Unger contends that the trial court did not adequately inquire into Unger's ability to pay restitution, the PSI contains detailed information about Unger's financial condition. In particular, the record shows that Unger had an IRA valued at $60,000. Appellant's App. p. 396. Unger's bank accounts were valued at approximately $20,000, and there is no indication that those values had changed. Id. at 194. He also possessed corn that was valued somewhere between $50,000 and $60,000. Although Unger owed the bank approximately $85,000, he had substantially reduced that debt. Id. at 194, 396. Finally, the PSI indicated that Unger was a self-employed truck driver and was working three to five days per week. Id. at 396. In short, we conclude that the trial court adequately inquired into Unger's ability to pay. See Mitchell v. State, 559 N.E.2d 313, 315 (Ind. Ct. App. 1990) (holding that the review of the presentence report that contained information on the defendant's financial status and employment history was sufficient inquiry into the ability to pay).

Nonetheless, Unger also challenges the amount of restitution that the trial court ordered him to pay. The $46,646.21 amount included $15,002.00 in lost wages to Jack from UPS. Unger notes that during Jack's testimony, the prosecutor asked: "Your claim for lost wages claims twenty weeks at $750.10 a week is that correct?" Tr. p. 636.

31

Although Jack agreed, Unger asserts that the calculation was incorrect because State's Exhibit 7 includes a copy of Jack's paystub from UPS, which reflects a pay period from September 1, 2007 to September 15, 2007; a period of two weeks. And for that pay period, Jack was paid a salary of $880.00, with an additional $4.06 for 15 minutes, presumably in overtime. The paystub also shows a year-to-date total of $15,002.15. Unger points out that the amount averages to about $830 per two week pay period. Therefore, Unger asserts that the correct calculation with regard to Jack's lost wages would be twenty weeks, or ten pay periods at $880.00 per pay period, for a total of $8,800.00.

In contrast, the State urges that Unger's calculation for lost wages is flawed. The State points out that there is no dispute that Jack was entitled to restitution for his lost wages from UPS. As the trial court noted, Jack was entitled to claim compensation for a much longer period than he requested. Tr. p. 656. Jack had been unemployed for over one year at the time and had only received disability compensation for six months. Id. at 635-36, 641-42, 656.

At the hearing, Jack claimed lost wages for twenty weeks, less than half of the uncompensated period of his unemployment, at a rate of $750.10. Tr. p. 636. Jack also submitted a paycheck stub from UPS for the two-week period during which he was first injured. Sent. Ex. 7. That exhibit shows a salary of $880 and year-to-date income of $15,002.15. We are unable to glean from the record as to what the $750.10 figure was based upon.

32

The State also points out that it is unclear as to whether Jack worked at UPS during all of 2007, such that the year to date pay represents full employment for the year. Indeed, Jack was unemployed and without compensation for more than forty weeks at the time and he could have sought restitution for that whole period. In light of this confusion—as recognized by both parties—the record is not adequate to resolve the issue. Thus, it is better left for the trial court to address this issue on remand, if any restitution amount remains outstanding.

Finally, if it is determined that an amount of restitution remains outstanding, both Unger and the State concede that the trial court did not fix the manner and amount of restitution payments to be paid as a condition of probation. Indeed, the trial court is required to fix the manner in which the defendant is to pay restitution pursuant to Indiana Code section 35-38-2-2.3(a)(5).

Here, because the trial court deferred that decision to be performed by the probation department at a later date, the restitution order did not comply with the statute. See Garrett v. State, 680 N.E.2d 1, 3 (Ind. Ct. App. 1997) (finding the restitution order unreasonably vague where trial court ordered the defendant to make a good faith effort to pay restitution of $90,000 "as determined by the probation department"). Therefore, remand is appropriate in this instance to permit the trial court to determine whether any

restitution obligation remains, to calculate the amount still owed, and to fix the manner in which Unger is to make payment.[3]

The judgment of the trial court is affirmed and remanded with the instructions that the trial court determine the amount of any outstanding restitution obligation and, if so, fix the manner of payment.

DARDEN, J., and BAILEY, J., concur.

---

[3] Although there is some indication in the record that Unger may have received proceeds from a legal settlement out of which he agreed to pay restitution to Jack, appellant's app. p. 465-68, 479, it is not clear from the record whether Unger has fully paid his restitution obligation.